[Cite as *State v. Pinckney*, 2017-Ohio-2836.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | |
|---|---|
| STATE OF OHIO/CITY OF AKRON | C.A. No. 28201 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOSEPH PINCKNEY | AKRON MUNICIPAL COURT COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. 15TRD05565 |

DECISION AND JOURNAL ENTRY

Dated: May 17, 2017

CALLAHAN, Judge.

**{¶1}** Appellant, Joseph Pinckney, appeals from his convictions in the Akron Municipal Court. This Court affirms.

I.

**{¶2}** Mr. Pinckney was convicted after a jury trial of drag racing and driving under suspension.

**{¶3}** Mr. Pinckney timely appeals his convictions, raising two assignments of error.

II.

**ASSIGNMENT OF ERROR ONE**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN, FACED WITH A POTENTIALLY DEADLOCKED JURY, IT ISSUED COERCIVE AND CONFUSING JURY INSTRUCTIONS IN VIOLATION OF MR. PINCKNEY'S RIGHTS TO A FAIR AND IMPARTIAL JURY AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

{¶4} At issue in this case are two sets of instructions given to Mr. Pinckney's jury after the foreperson advised the court that it had not reached a unanimous verdict. Mr. Pinckney contends the first instructions were confusing and the second instructions were both confusing and coercive.

Standard of Review

{¶5} Mr. Pinckney concedes his trial counsel did not object to the jury instructions, but contends this Court should review this assignment of error under an abuse of discretion standard because Mr. Pinkney, himself, objected to the instructions.

{¶6} The Supreme Court of Ohio has held that while a criminal defendant has "the right either to appear pro se or to have counsel, he has no corresponding right to act as co-counsel on his own behalf." *State v. Thompson*, 33 Ohio St.3d 1, 6-7 (1987). "The right to counsel and the implied right to appear pro se are independent of each other and may not be asserted simultaneously." *State v. Jackson*, 9th Dist. Summit Nos. 24463, 24501, 2009-Ohio-4336, ¶ 13, citing *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, ¶ 32. There is no constitutional right to hybrid representation. *State v. Bloodworth,* 9th Dist. Summit No. 26346, 2013-Ohio-248, ¶ 3, citing *Martin* at ¶ 31. In this case, Mr. Pinckney was represented by counsel throughout the proceedings.

{¶7} Further, Crim.R. 30(A) states that "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects *before* the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury." (Emphasis added.)

{¶8} Even if this Court were to consider Mr. Pinckney's comments to the trial court to be an "objection," it was raised after the jury had been retired to deliberate. Moreover, Mr. Pinckney's comments centered on his concern for fairness, but lacked any specificity as to why the instructions were unfair.

{¶9} Based upon the applicable law and the record in this case, the appropriate standard of review is plain error.

### *Howard* Charge vs. *Martens* Charge

{¶10} In *State v. Howard*, 42 Ohio St.3d 18 (1989), the Ohio Supreme Court approved a supplemental charge to be given to juries deadlocked on the question of conviction or acquittal. *Id.* at paragraph two of the syllabus. The charge must be balanced and neutral, and comport with the following goals: (1) encourage a unanimous verdict only when one can conscientiously be reached, leaving open the possibility of a hung jury and resulting mistrial; and (2) call for all jurors to reevaluate their opinions, not just the jurors in the minority. *Id.* at 25.

{¶11} On the other hand, the *Martens* instruction "is appropriately given when it appears to the court that the jury, after deliberating for a reasonable period of time, is unable to reach a verdict. The instruction changes the focus of deliberations by asking the jury to decide whether any verdict can be reached through further deliberations." *State v. Martens*, 90 Ohio App.3d 338, 343 (3d Dist.1993).

{¶12} In this case, after one hour and twenty-five minutes of deliberations, the trial court informed the parties, "[t]he jury called and informed my bailiff that seven of them have reached a verdict. They have not stated what that is. One person quote 'will not budge[.]'" The court, with the approval of the parties, read the jury both the *Howard* instruction (*Ohio Jury*

*Instructions*, CR Section 429.09(2), Verdict Possible-Deadlocked Jury) and the *Martens* instruction (*Ohio Jury Instructions*, CR Section 429.09(3), Verdict Impossible).

{¶13} Mr. Pinckney concedes the *Howard* charge portion of the trial court's instructions was "near-verbatim." However, he takes issue with the court's addition of the *Martens* charge. After concluding the *Howard* charge, the court continued with the following instruction:

> It's customary for the [c]ourt to inquire if there [is] a possibility of reaching an agreement within a reasonable period of time. The [c]ourt will, therefore, submit this question to the foreman with the instruction that the answer be either yes or no. So when you go back up, you're going to have to answer this question. Don't disclose any other information. Don't indicate the status of your deliberations, but the question for you to consider, yes or no, "Is there a possibility that after an additional period of, today or tomorrow, you may reach an agreement?" "Is there a possibility that after an additional period of time, today or tomorrow, you may reach an agreement?" I'm going to ask you to retire to the jury room and consider that question and the foreperson should send back an answer on a piece of paper that is either yes or no, and then if it's yes, you'll keep deliberating and if it's no, then we'll talk and decide what to do next, okay. Thank you.

{¶14} Mr. Pinckney contends the trial court erred because its addition of the *Martens* charge was confusing to the jury. This Court agrees.

{¶15} In its initial communication to the court, Mr. Pinckney's jury did not indicate that reaching a verdict would be impossible. It merely advised the court of the situation in which it found itself. It had been deliberating for less than 90 minutes. The court responded appropriately with the *Howard* charge, the purpose of which is to encourage the jury to reach a verdict, if it can do so conscientiously. However, the court mistakenly added the *Martens* charge and directed the jurors to answer "yes or no" as to whether further deliberations would serve any purpose. "If given prematurely, the [*Martens*] instruction may be contrary to the goal of the *Howard* charge of encouraging a verdict where one can conscientiously be reached." *Martens*, 90 Ohio App.3d at 343. Because the purposes of the two instructions are inapposite, giving them at the same time is understandably confusing.

{¶16} The jury's confusion was evidenced by its conduct. It retired for "20 seconds" then immediately contacted the court, telling the court that the answer to the question it had posed was "no." The trial court had the opportunity to redirect the jury when it instructed it again. And while the court began the instructions with a suitable *Howard* charge, it thwarted that instruction by again adding *Martens* language:

> * * * and so when I asked you to take a moment and to consider whether there's a possibility that after an additional period of time, today or tomorrow, you may reach [an] agreement, you gave me back a no within 20 seconds. Now, that may truly be your answer and if it is, that's okay. But I am going to send you back upstairs to spend a little more time on that issue, because the law requires that we give reasonable period[s] of time for you, in a new assignment and a new situation with people you have just met, to try to reach an agreement if one can be reached without surrendering your own individual judgment. So, I don't want you to feel frustrated. Although, I know that sometimes it can be a frustrating process.
>
> If you decide, after taking time and having the foreperson direct each individual person, whether or not they can reevaluate their view, if after doing that you collectively believe that your answer truly is no, then call to my bailiff, let her know that and we will bring you back down. * * *
>
> Remember the question: Is there a possibility that after additional time, today or tomorrow, you may reach an agreement? And if the answer is yes, it's yes. If it's no, it's no, but take some time and consider that and let us know.

{¶17} The jury again retired and subsequently found Mr. Pinckney guilty on both counts. Upon the request of Mr. Pinckney's counsel, the trial court polled the jury confirming their verdicts.

{¶18} Mr. Pinckney contends the second charge was also confusing. Again, this Court agrees. Despite the court beginning with the *Howard* charge language, which encouraged the reevaluation of the jurors' positions with a goal toward reaching a verdict, the remainder of the instruction was almost entirely focused on asking the jurors to determine whether there was any reason to continue to deliberate.

{¶19} Mr. Pinckney further contends the second charge was coercive because the trial court "telegraphed [its] frustration to the jury," and the jury returned a guilty verdict "[t]o avoid irritating the [] court any further."

{¶20} The record shows the trial court was frustrated with the short amount of time the jury took to return its initial "no" answer and said to counsel "I would have felt more comfortable that they went upstairs and conscientiously reexamined their positions. There's no way they did that in 20 seconds." However, the record also reflects that Mr. Pinckney's trial counsel told the court "I guess what I don't want them to perceive is that the [c]ourt is not satisfied with having anything but a unanimous decision and if they are, that's not acceptable," to which the trial court responded "I agree with you. I will make sure not to act frustrated on the record." Mr. Pinckney's trial counsel did not object to the second instructions or to the trial court's manner of delivering that instruction.

{¶21} In light of these facts, and because the record is silent as to how long the jury deliberated before returning its verdict, we cannot find that the trial court coerced the jury into reaching its verdict.

{¶22} Having found that the trial court's instructions to the jury were confusing, and that the *Martens* charge was given prematurely, this Court must now consider whether the trial court committed plain error.

{¶23} Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's confidence in, the judicial proceedings. *State v. Tichon*, 102 Ohio App.3d 758, 767 (9th Dist.1995). A reviewing court must take notice of plain error only with the utmost

caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. Lorain No. 03CA008241, 2004-Ohio-1067, ¶ 12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless "appellant [has] established that the outcome of the trial clearly would have been different but for the alleged error." *State v. Kobelka*, 9th Dist. Lorain No. 01CA007808, 2001 WL 1379440, *2 (Nov. 7, 2001), citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996). In addition, the Ohio Supreme Court has stated that "[a]n erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, ¶ 56, citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus.

{¶24} While the combination of instructions was obviously initially confusing to the jury, it was given a second opportunity to tell the trial court that it found it impossible to reach a verdict. Instead, it deliberated the single issue presented for its consideration (whether Mr. Pinckney was the driver of the vehicle observed by the officers) and ultimately reached a unanimous guilty verdict. The court polled the jury to confirm their verdicts. Mr. Pinckney has failed to establish that the outcome of his trial clearly would have been different but for the trial court's error.

{¶25} Mr. Pinckney's first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

MR. PINCKNEY'S CONVICTIONS FOR DRIVING UNDER SUSPENSION AND DRAG RACING WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.

{¶26} Mr. Pinckney next argues that his convictions for driving under suspension and drag racing were against the manifest weight of the evidence. He does not challenge the minor misdemeanor convictions of which he was found guilty by the trial court.

**{¶27}** If a defendant asserts that a conviction is against the manifest weight of the evidence,

> an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). Weight of the evidence concerns whether a greater amount of credible evidence produced in a trial supports one side over the other side. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

**{¶28}** When reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should only exercise its power to reverse a judgment as against the manifest weight of the evidence in exceptional cases in which the evidence weighs heavily against the conviction. *State v. Carson*, 9th Dist. Summit No. 26900, 2013-Ohio-5785, ¶ 32, citing *Otten* at 340.

**{¶29}** "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." *State v. Haydon*, 9th Dist. Summit No. 19094, 1999 WL 1260298, *7 (Dec. 22, 1999), citing *State v. Gilliam*, 9th Dist. Lorain No. 97CA006757, 1998 WL 487085, *2 (Aug. 12, 1998). An appellate court will not overturn a judgment on this basis alone, and may not merely substitute its judgment for that of the factfinder. *State v. Serva*, 9th Dist. Summit No. 23323, 2007-Ohio-3060, ¶ 8.

{¶30} Akron City Code 71.07, Driving under suspension or revocation, states that "[n]o person, whose driver's or commercial driver's license * * * has been suspended or revoked pursuant to R.C. Chapter 4509 shall operate any motor vehicle within this municipality, * * *."

{¶31} Akron City Code 73.23(B), Drag racing prohibited on public street or highways, states that "[n]o person shall participate in a drag race as defined in subsection A of this section upon any public road, street, or highway in this municipality." Subsection A defines "'drag racing'" as

> the operation of two or more vehicles from a point side by side at accelerating speeds in a competitive attempt to outdistance each other, * * *. The operation of two or more vehicles side by side either at speeds in excess of prima facie lawful speeds * * *, or rapidly accelerating from a common starting point to a speed in excess of such prima facie lawful speeds shall be prima facie evidence of drag racing.

Akron City Code 73.23(A).

{¶32} Mr. Pinckney does not challenge the officers' conclusion that they witnessed a drag race and he stipulated to the fact that his operator's license was suspended at the time of his arrest. Mr. Pinckney asserts that he was not driving the vehicle.

{¶33} In the evening of April 1, 2015, while on Lovers Lane approaching South Arlington Street, Akron Police Officers Timothy Shmigal and Joseph Sterling heard engines revving and then observed two vehicles traveling southbound on South Arlington Street "driving at a very high rate of speed[,] weaving in and out of traffic without signaling, side by side[,] clearly in a race." The officers immediately tried to catch up to the vehicles. They observed the vehicles for approximately one mile, from the 500 or 600 block of South Arlington Street to the 1400 block, where the two vehicles "braked hard" and pulled into the Arlington Plaza parking lot. Officer Shmigal visually estimated the vehicles' speed to be 60-70 mph. Both officers testified there were only two vehicles involved in the race and they never lost sight of them. The

officers caught up to the vehicles when they entered the plaza parking lot. Officer Shmigal pulled his cruiser between the two vehicles, slowed to about 5 mph to allow Officer Sterling to jump out of the cruiser, then proceeded to the Chrysler 300 and stopped. Officer Sterling approached the Dodge Magnum, which was parking in front of the liquor store. There was no other vehicle parked in that immediate area of the Chrysler 300.

{¶34}  Never losing sight of the Chrysler 300, Officer Shmigal observed Mr. Pinckney jump out of the driver's seat of the car and quickly move 20 yards away, "[l]ike[] he was trying to get away from the car." Officer Shmigal did not observe anyone else get into or out of the Chrysler 300, but there was a female passenger in the front seat.

{¶35}  Officer Shmigal told Mr. Pinckney to stop and Mr. Pinckney said "I wasn't driving." Mr. Pinckney told Officer Shmigal he climbed from the back seat into the front seat and asked Officer Shmigal to speak to the female passenger. Both officers described the female passenger as intoxicated. Neither officer had any recollection of any female identifying herself as Mr. Pinckney's sister.

{¶36}  Both officers testified there were very few people around when they made the initial stops, but a group started to gather when the vehicles were being towed.

{¶37}  Neither officer recalled anything about the keys for the Chrysler 300, nor did they recall who the registered owner of the vehicle was. Officer Shmigal testified there were other cars parked in the area.  He did not recall any of them being occupied, but admitted it was possible.  He denied that anyone approached Mr. Pinckney and spoke to him.

{¶38}  Mr. Pinckney testified he and a group of people left the home of the owner of the Dodge Magnum and went to the liquor store at Arlington Plaza.  Mr. Pinckney was a passenger in a yellow Dodge Charger, owned by his sister. All three vehicles left the party at the same time,

but the Dodge Charger, being driven by a man whose name Mr. Pinckney did not know, took a different route and arrived at the liquor store first. Mr. Pinckney testified he was standing outside of the Dodge Charger for five to ten minutes talking to his sister, who was sitting in its passenger seat, when he saw the Dodge Magnum and Chrysler 300 pull into the lot. He testified the vehicles did not drive in fast and everyone, including the driver of the Dodge Charger, went inside the liquor store. According to Mr. Pinckney, when the police arrived he was the only one standing outside of a vehicle.

{¶39} Mr. Pinckney testified the cruiser pulled up in front of the Dodge Charger and the Chrysler 300. Mr. Pinckney was still leaning into the passenger side of the Dodge Charger talking to his sister when the officer immediately told him to get back in the car. Mr. Pinckney was insistent that he was not driving but was placed under arrest anyway. Mr. Pinckney admitted his license was suspended and testified that was the reason he was not driving. His sister did not testify.

{¶40} On cross-examination, Mr. Pinckney admitted he had not mentioned his sister until the night before his trial, even though his case had been pending for nine months and he had been to court numerous times.

{¶41} This Court recognizes that "the trier of fact is in the best position to determine the credibility of witnesses and evaluate their testimony accordingly," *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15, and will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version, *State v. Tabassum*, 9th Dist. Summit No. 25568, 2011-Ohio-6790, ¶ 27.

**{¶42}** Having reviewed the record, this Court cannot say the jury clearly lost its way and created a manifest miscarriage of justice in choosing the State's version of the events over Mr. Pinckney's. The weight of the evidence supports the conclusion that Mr. Pinckney was driving a vehicle that was drag racing and at the time his operator's license was suspended.

**{¶43}** Mr. Pinckney's second assignment of error is overruled.

III.

**{¶44}** Mr. Pinckney's assignments of error are overruled. The judgment of the Akron Municipal Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, P. J.
TEODOSIO, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

JACQUENETTE S. CORGAN, Attorney at Law, for Appellant.

EVE V. BELFANCE, Director of Law, GERTRUDE E. WILMS, Chief Prosecutor, and BRIAN D. BREMER, Assistant Director of Law, for Appellee.